1

2

3

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7

8                    FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10   SANDRA RAMIREZ,

11              Plaintiff,                          No. C 14-04211 WHA

12        v.

13   AVALONBAY COMMUNITIES, INC.,            **ORDER GRANTING**
     and DOES 1–50, inclusive,               **DEFENDANT'S MOTION FOR**
14                                            **SUMMARY JUDGMENT**

15              Defendants.
     _____/

16

17                              **INTRODUCTION**

18        In this employment-discrimination action, defendant moves for summary judgment on all

19   claims.  To the extent stated below, defendant's motion is **GRANTED**.

20                               **STATEMENT**

21        From 2010 to 2014, plaintiff Sandra Ramirez, a lesbian, was employed as a leasing agent

22   with defendant AvalonBay Communities, Inc., a firm that developed, redeveloped, and managed

23   apartment communities.  She worked first at a property in Dublin, California.  Her primary duty

24   was to obtain lease agreements and renewals from new and existing tenants, and her pay was

25   based, in part, on commissions.  Another aspect of Ramirez's duties involved interacting with

26   customers as they came into the office with questions or concerns about their apartments.  As in

27   any service industry, customers often complained about the quality of service provided by

28

*(left margin, rotated)* **United States District Court**  For the Northern District of California

AvalonBay's employees, including Ramirez. Those complaints were registered in surveys sent to residents.[1]

Ramirez initially reported to community service manager Shirley O'Keefe, who, in turn, reported to the general manager, Bardya Kahrobaie. Five months into Ramirez's employment, however, a new manager, Shannon Drozen, transferred to the Dublin property, so Ramirez and O'Keefe both began reporting directly to Drozen (Ramirez Dep. at 27–30, 39).

In early 2011, Kahrobaie met with Ramirez to discuss her written annual performance evaluation, for five months of work in 2010. Ramirez received an overall score of 3.02 out of 5, which corresponded to "Acceptable; Meets Expectations." Her customer focus and professionalism scores, however, were 2.75, which corresponded to "Development Needed; Some Expectations Not Met." Her key strengths were "Independence," "Technology," and "Teamwork," and she was described as a "great team player." Her areas for improvement were "Professional Appearance," "Multi-Tasking," and "Daily Procedures" (Ramirez Decl., Exh. 1 at 2–4).

Later in 2011, Drozen spoke to Ramirez because Ramirez had left a note with O'Keefe informing her she would be out sick, rather than calling. Drozen reminded Ramirez that she was required to call her on-site supervisor, who was Drozen, by phone if she needed to miss work. Ramirez responded that she didn't have Drozen's contact information, but agreed that she would call if she couldn't come into work in the future. Drozen prepared a written associate-discussion record detailing that incident (Drozen Decl., Exh. A). Ramirez does not dispute discussing the incident with Drozen, but she notes that she never signed the write-up and that Drozen's signature is typed (Ramirez Decl. ¶ 10). Nevertheless, she does not the content of the write-up.

In early 2012, Drozen discussed Ramirez's written annual performance evaluation for 2011. Ramirez received an overall score of 3.15, which again corresponded to "Acceptable; Meets Expectations." Her customer service and professionalism scores improved to 3.00, which

---

[1] Ramirez has requested judicial notice of the reviews on Yelp.com for the two AvalonBay properties at which she worked as evidence that customers complained about numerous topics. Both sites display a number of complaints from residents about employees, rent, and other residents. The sites also include a number of positive reviews. The Court accepts as true, as it must on summary judgment, Ramirez's contention that AvalonBay's residents complained about numerous subjects.

2

**United States District Court**
For the Northern District of California

also corresponded to "Acceptable; Meets Expectations." That evaluation noted that Ramirez was ready "to take on more challenges on a day to day basis." Drozen also indicated "[r]ather than waiting to be asked to complete a task (renters insurance, following up with renewals, etc.) I'd like Sandy to pro-actively begin to complete these tasks . . . ." Her key strengths were "Organization," "Fast Learner," and "Punctuality." Her areas for improvement were "Perceived Demeanor," "Executive Presence," and "Initiative" (Ramirez Decl., Exh. 2 at 3–4).

Two months later, Drozen discussed a customer complaint about Ramirez's demeanor with Ramirez and prepared a written associate discussion record (Drozen Decl., Exh. B). Ramirez "does not recall" discussing this event with Drozen and avers she never saw the write-up from that discussion (Ramirez Decl. ¶ 10). Nevertheless, the write-up demonstrates that Drozen in fact discussed this complaint with Ramirez, and Ramirez does not deny it occurred as set forth in the memo. Ramirez also admits that Drozen spoke to her about specific complaints from residents on other occasions (Ramirez Dep. at 53).

In January 2013, Ramirez fell and injured her knee, which limited her ability to walk. Her doctor restricted her from conducting tours, and Ramirez gave that information to Drozen, Kahrobaie, and Myesha Zeigler, who was another community manager at the Dublin property. Ramirez was temporarily reassigned to a different property where she did paperwork until she could walk again. Ramirez eventually returned to the Dublin property, where she resumed her old job, subject to a limitation of performing three tours a day (Ramirez Dep. at 80–81). Ramirez's medical restriction made no mention of her ability to climb stairs.

Ramirez became concerned about how her limited touring would affect her commissions. She asked human resources manager Grace Naylor whether she could be compensated for her commissions through worker's compensation. Naylor informed her that she did not know whether she could be compensated for lost commissions through worker's compensation. Ramirez asserts that Naylor was aware that she was specifically limited to three tours a day because Ramirez's claims adjuster had to communicate directly with Naylor, however, she has offered no evidence that her claims adjuster actually spoke with Naylor, much less any evidence of the contents of any such conversation (Ramirez Decl. ¶ 12).

1   Zeigler conducted Ramirez's 2012 performance review.  Ramirez received an overall

2   score of 3.25, which again corresponded to "Acceptable; Meets Expectations."  Ramirez's scores

3   for "Communication," "Customer Focus," "Professionalism," and "Teamwork" were all 3.00,

4   which also corresponded to "Acceptable; Meets Expectations."  Ramirez received scores in other

5   categories that corresponded to "Commendable; Often Exceeds Expectations" (Ramirez Decl.,

6   Exh. 4 at 3–5).

7   Zeigler also evaluated Ramirez's specific customer service goals (*id.* at 2):

8   Sandy and her manager have discussed some specific comments
    made about Sandy from residents.  It is important for Sandy to
9   always remember we are here to provide excellent customer
    service to our customers . . . .

10   She further wrote (*id.* at 4):

11   

12   Sandy has made strides in her verbal and nonverbal
     communication that has effected [sic] customer service scores.  I'd
     like her to continue to be thoughtful of how her interactions with
13   our customers could be perceived no matter the situation.

14   Finally, Zeigler noted, "[b]eing in Sales can be very competitive at times and I'd like Sandy to

15   ensure that this does not effect [sic] any aspect of teamwork at the community" (*ibid.*).

16   "Verbal/nonverbal communication" ranked as her area for improvement for that year.

17   In 2013, AvalonBay sold the Dublin property where Ramirez worked, so she was

18   transferred to the Walnut Creek property, which AvalonBay had recently purchased.  The

19   Walnut Creek property rated bigger than the Dublin property, so Ramirez viewed this as a "great

20   opportunity" (Ramirez Dep. at 64).  She avers that she was moved there "as per Mr. Kahrobaie's

21   directive to assist in implementing the Avalon way of doing business" (Ramirez Decl. ¶ 13).

22   Ramirez and the other leasing agents at Walnut Creek reported directly to customer service

23   supervisor Leonifel Silva.  Ramirez informed the general manager initially assigned to Walnut

24   Creek of her touring restrictions, but a new general manager, James Speltz, took charge three

25   months into Ramirez's time there (Ramirez Dep. at 81).

26   Speltz and the other managers hoped that Ramirez would help integrate her co-workers at

27   the Walnut Creek property, but Speltz quickly heard complaints from other managers and

28   Ramirez's co-workers that Ramirez was not contributing to mundane group tasks such as sorting

United States District Court

For the Northern District of California

1   parcels and mail that did not yield commissions.  Co-workers also complained that Ramirez

2   conducted unit inspections during the last hour of the day when the office tended to be busy with

3   residents making complaints, although employees were instructed to conduct inspections earlier

4   (Speltz Decl. ¶ 6–7).  Speltz did not record these complaints.

5        Ramirez doubts that Speltz ever actually received any complaints about her from co-

6   workers.  The only evidence Ramirez offers to dispute Speltz's declaration is a paragraph in her

7   own declaration averring that a co-worker, Mary Bennett, showed her phone to Ramirez to

8   demonstrate that she had made no complaints to Speltz about her contributions to the team at

9   Walnut Creek (Ramirez Decl. ¶ 25).  Ramirez's description of Bennett's response to Ramirez's

10   inquiry is inadmissible hearsay.  Ramirez has first-hand knowledge of what she saw on the

11   phone, but that in no way proves what may have been deleted or otherwise communicated to

12   speltz by Bennett.   Ramirez's statement that no one else complained to Speltz is unfounded

13   speculation.

14        Ramirez avers that Speltz maintained a "negative and aggressive attitude" towards her.

15   She claims "it seemed like [Speltz] was going to move all 3 gay employees to the back office

16   which was in a different location than his," and where leasing agents were less likely to get

17   commissions from touring customers that stopped by.  Ramirez has no personal knowledge of

18   Speltz's subjective intent, so that statement is inadmissible.  Moreover, Ramirez asked Speltz not

19   to move her to the back office.  Speltz obliged, although the two other gay employees were

20   moved to the back.  One employee expressed anger about that move to Ramirez (Ramirez Decl.

21   ¶ 14).[2]  That employee has since transferred to a property in San Francisco at his own request

22   (Speltz Decl. ¶ 20).

23        In August 2013, Speltz approached Ramirez about a resident complaint about her.

24   Ramirez had taken the resident to tour a new unit on the third floor.  Ramirez gave the resident

---

[2]  AvalonBay objects to Ramirez's statements that the other two gay employees were moved to the back and that one expressed anger on hearsay grounds and for lack of personal knowledge, lack of foundation, and speculation.  Ramirez avers that she directly observed that the gay employees were moved to the back, so she does not lack personal knowledge or foundation, at least under the rules of evidence.  The statement of anger pertained to the declarant's then-present condition, so it is admissible hearsay.  Fed. R. Evid. 803(3).  Ramirez claims the statement was made directly to her, so she has personal knowledge of the statement.

**United States District Court**
For the Northern District of California

1    the keys and told her to tour on her own while Ramirez waited downstairs.  Ramirez informed

2    Speltz that she did not go upstairs because of her medical restriction (Ramirez Decl. ¶ 15).  This

3    was the first time Ramirez informed Speltz of her restrictions (Ramirez Dep. at 82).  Speltz

4    asked to see documentation of Ramirez's restrictions, so she provided a doctor's note from three

5    weeks prior to that date that informed Speltz that Ramirez could only perform a certain number

6    of tours per day, although it made no mention of Ramirez's ability (or not) to climb stairs (Speltz

7    Decl. ¶ 8).  Ramirez now offers her own speculation, not based on any personal knowledge, that

8    the resident complained in order to negotiate a better price in renewing her lease, but she does

9    not offer any admissible evidence to support that contention (Ramirez Decl. ¶¶ 15–16).

10       Speltz informed Ramirez that she needed to keep her managers apprised of her medical

11   restrictions and placed her on modified duty.  He prepared a written associate-discussion record

12   of that conversation, but elected not to issue a written warning for not climbing the stairs (*id.*,

13   Exh. 5).  Speltz avers that he assigned Ramirez to the back office, but that she was still in the

14   rotation to conduct tours (subject to her three-tour-a-day limitation) and she could also work on

15   online leases (Speltz Decl. ¶ 9).  Ramirez insists her new assignment denied her from touring at

16   all (Ramirez Decl. ¶ 16).  The next day, Ramirez returned with a new doctor's note allowing her

17   a temporary lift on her medical restrictions, so Speltz reinstated her to full duty.

18       A new community manager, Joseph Frederick, was transferred to Walnut Creek soon

19   after Speltz started as general manager, and Frederick reported to Speltz.  Frederick heard

20   several complaints from residents that Ramirez promised certain things and would not deliver or

21   that she had been "rude or short" with them.  He noted "[a]ll employees occasionally get

22   complaints from residents and some particular residents can be difficult.  However, Ms. Ramirez

23   received more complaints from residents than any other employee."  Frederick generally elected

24   to discuss complaints directly with Ramirez rather than writing her up (Frederick Decl. ¶ 6).

25       Ramirez began dating her current girlfriend in December 2013 (Ramirez Decl. ¶ 17).

26   Ramirez's girlfriend came into the office on several occasions in order to pick Ramirez up from

27   work.  On one occasion, Ramirez's girlfriend waited at the office for Ramirez for 45 minutes

28   while she filled out an incident report because she had fallen and hurt her knee again (Do Decl.

¶ 4; Ramirez Decl. ¶ 18).  Frederick heard several complaints from co-workers about how often Ramirez had visitors and asked Ramirez not to spend time with visitors during work hours (Frederick ¶ 9).  Ramirez avers that another heterosexual co-worker had a visitor around the same time and offers her own (inadmissible) speculation that none of the managers asked that heterosexual employee to stop having visitors (Ramirez Decl. ¶ 18).

Throughout December 2013, Ramirez was subject to numerous disciplinary actions. First, Speltz wrote Ramirez up because an audit of Walnut Creek's renewal efforts for the previous month showed that she was the only employee who had not made any follow-up calls to customers to remind them to renew their leases.  Less than a quarter of the residents assigned to Ramirez had renewed their leases, which was below the community average.  Additionally, Speltz noted that one of Ramirez's assigned residents complained that he was charged a late fee because Ramirez did not execute his renewal lease on time.  That write-up was signed by Ramirez and included the statement, "I understand that a further violation of any policy, procedure, or rule of conduct by me may be cause for further disciplinary action or termination" (Speltz Decl., Exh. D).

Ramirez disputes the accuracy of the zero follow-up number on the audit report, although she admits she may have made follow-up calls but failed to record them properly (Ramirez Dep. at 91).  Ramirez asked Speltz to give her a verbal warning, rather than a write-up, but he said he needed to make an example of her because Walnut Creek had the worst renewal rate company-wide (Ramirez Decl. ¶ 19).

At one of her counseling meetings with Speltz, Ramirez asked if she was a poor employee, given how many write-ups she was getting, and she claims he said "No.  As a matter of fact, you were tied for number one in sales in all of Northern California" (Ramirez Dep. at 129).  Ramirez does not specify when that conversation occurred, except that it was prior to a write-up she received in February 2014.

Ramirez immediately went about contacting residents about lease renewals.  As she was making those calls, another employee asked Ramirez to help sort packages.  Ramirez responded that she would help as soon as she finished the renewal follow-up calls, but by the time she was

United States District Court
For the Northern District of California

1  done with the calls, the packages had been sorted (Ramirez Decl. ¶ 20).  This event was reported

2  to Silva.  A maintenance employee also reported to Silva that Ramirez had spoken in a

3  disrespectful tone because the employee had not prepared a move-in packet.  Silva, in turn,

4  reported both of these complaints to Frederick who confirmed the details of the complaints with

5  other members of his team.  Frederick then discussed these events with Ramirez and prepared a

6  written record of that discussion (Frederick Decl., ¶ 7, Exh. A).

7       One evening in December, Ramirez turned away a couple, who were prospective

8  residents, that asked for a tour after 4:30 p.m.  Generally, tours were not given after 4:30 in the

9  winter.  Ramirez then turned away an individual current resident who had arranged a late tour

10  with Silva in order to accommodate her work schedule.  Ramirez believed touring an individual

11  after refusing a couple would violate fair housing laws.  The resident complained that Ramirez

12  had been "rude and abrupt" and that Ramirez said "whomever was assisting [her] in the original

13  office should have followed up and provided the tour" (Frederick Decl., Exh. B).  Silva avers

14  that she gave Ramirez specific instructions to make an exception for the resident in order to

15  accommodate her schedule (Silva Decl. ¶ 8).  Ramirez admits that Silva likely called to give

16  such instructions, but she did not pick up the phone (Ramirez Dep. at 125–26).

17       Frederick conducted a disciplinary meeting with Ramirez about that incident and

18  prepared a write-up.  Ramirez explained her concerns about fair housing laws, but Frederick

19  doubted that there would have been a legal issue, given that the latter customer was already a

20  resident, rather than a prospective resident, and Silva had specifically arranged for a tour after

21  4:30.  Frederick also told Ramirez that even if she had a good reason not to conduct the tour,

22  there was no excuse for being rude to a customer and that she should have called Silva if there

23  was any concern about conducting a tour (Frederick Decl. ¶ 8).

24       Given the frequency of the issues Frederick was having with Ramirez, he spoke with a

25  human resources manager, Grace Naylor, and suggested that this write-up should be a final

26  warning.  Naylor approved.  The written counseling record, which Ramirez signed, stated,

27  "[a]ssociate is aware that future occurrences of customer service failures will result in further

28  action including termination."  Ramirez was also directed to review certain customer-satisfaction

8

United States District Court

For the Northern District of California

training videos (*id.* ¶ 8, Exh. B).  Ramirez did not complete those training videos (she is not certain whether she started them) because she "didn't want to take time out of [her] free time" (Ramirez Dep. at 139–40).

Ramirez avers that Speltz actually conducted the meeting about her refusal to tour the individual, although the documentation of the meeting bears Frederick's name (Ramirez Decl. ¶ 23, Exh. 6; Frederick Decl. Exh. 2).  Ramirez does not dispute the contents of the write-up.  Nevertheless, she insists that Speltz told her that she should have conducted the tour notwithstanding her concerns about a fair housing violation.

Ramirez generally felt that she had been performing according to expectations.  Her renewal rate increased by 60% after Speltz spoke with her about making follow-up calls, and she had strong sales numbers (Ramirez Decl. ¶ 22).  Thus, she felt she was being treated unfairly by being subject to numerous disciplinary actions and based on how Speltz handled her knee injury.  Ramirez scheduled a meeting with Naylor in San Jose.  Ramirez was late to the meeting, so Naylor only had 45 minutes to discuss her concerns, after which she rushed Ramirez out (Naylor Decl. ¶ 10).  Ramirez admits she did not mention that she felt she was being targeted based on her sexual orientation, although she did say she felt discriminated against.  Ramirez told Naylor that she believed one of her co-workers, Mary Bennett, was being accommodated for a disability so she was taken out of the rotation for work in the back office, and that she was never written up for anything.  She admitted to Naylor that she did not have personal knowledge of either of those facts (and she has submitted no admissible evidence of such facts now).  Naylor never made a follow-up call to Ramirez, although Ramirez also did not call Naylor back (Ramirez Dep. at 127–132).

Despite Frederick's prior conversations with Ramirez about visitors, he continued to hear complaints that Ramirez had visitors in the office more frequently than other employees, sometimes for more than an hour.  On one occasion in February 2014, a co-worker complained that a friend had been chatting with Ramirez in the middle of the day and distracted Ramirez from her work (Frederick Decl. ¶ 9).  Ramirez's girlfriend was visiting at that time in order to pick Ramirez up early because her car was in the auto shop (Do Decl. ¶ 4).  Frederick met with

United States District Court

For the Northern District of California

1   Ramirez about the series of complaints regarding visitors and prepared a write-up about it.

2   Frederick told Ramirez she could not have visitors in the office anymore (Frederick Decl.,

3   Exh. C).

4       Ramirez does not dispute that this conversation with Frederick occurred, but instead

5   offers her own deposition testimony that she heard someone in the halls of the office mention

6   that Speltz had a problem with Ramirez's girlfriend and that he directed Frederick to have this

7   conversation with her (Ramirez Dep. at 146–47).  Ramirez's testimony on that point is

8   inadmissible hearsay.  Frederick states that it was his decision to issue this warning but that he

9   forwarded the write-up to Speltz as per standard procedure (Frederick Decl. ¶ 10).

10      A few days later, Speltz left the office at 6:00 p.m. although the office closes at 6:30.  He

11  returned to retrieve his keys at 6:20 and found Ramirez chatting with her girlfriend at her desk

12  sitting in a chair reserved for customers.  Speltz prepared a written counseling record and met

13  with Ramirez.  Speltz knew Ramirez had already received a final warning, so he decided to give

14  Ramirez a second chance because he felt Ramirez's issue with visitors was distinct from her

15  customer service issues.  The documentation of this counseling record, which Ramirez signed,

16  read, "[t]his is Sandy's final warning.  Any further problems of any nature will result in

17  termination" (Speltz Decl., Exh. E).

18      Later that month, Silva forwarded Speltz a complaint from a new resident that Ramirez

19  had promised there would be stainless steel appliances in her unit when she conducted a tour of a

20  model unit, but that when she moved in, the appliances were not stainless steel.  Speltz met with

21  Ramirez to discuss this incident, and Ramirez claimed the customer was actually upset because

22  her move-in date had to be moved from a Monday to a Tuesday because the former was

23  President's Day.  Ramirez claimed the resident had never informed her of the issue with the

24  stainless steel appliances and attempted to show Speltz e-mails to prove that, though he refused

25  to review them (Ramirez Decl. ¶ 26).

26      Speltz suspended Ramirez and contacted the resident to confirm what had transpired,

27  since he knew customers fabricated complaints with ulterior motives.  After contacting the

28  resident, Speltz could not see any ulterior motive.  He also knew that Ramirez tended to make

excuses for any complaints lodged against her, so he believed the resident.  Speltz conferred with general manager Kahrobaie and they both agreed they had given Ramirez enough opportunities to improve, so it was appropriate to terminate her employment.  Speltz prepared a termination request form which was approved by Naylor (Speltz Decl. ¶¶ 22–25; Kahrobaie Decl. ¶ 11; Naylor Decl. ¶ 13).

Ramirez's employment was terminated on February 24, 2014.  Although Speltz would have ordinarily conducted the termination meeting, he was out of town, so Frederick filled in.  Ramirez avers that Frederick said "he wanted to keep [her] as an employee, in other words.  He would have — he would not have done this, that he's never really fired any employees" (Ramirez Dep. at 173).

\*                    \*                    \*

Ramirez commenced this action in state court in August 2014.  She asserted four claims (i) "Sexual Orientation Discrimination; Gov't Code Section 12940(a)," (ii) "Disability Discrimination/Failure to Accommodate; Gov't Code Section 12940(a)," (iii) "Harassment; Gov't Code Sec. 12940(j)," and (iv) "Tortious Discharge in Violation of Public Policy."  The action was removed to federal court on diversity grounds in September 2014.

Ramirez filed a motion for voluntary dismissal without prejudice in June 2015 because she wanted to join Speltz and Naylor as individual defendants although the deadline to seek leave to add new parties herein had long passed.  Ramirez was (wrongly) concerned the case would be dismissed for lack of jurisdiction if those additional parties were joined here, so she filed an action in state court against AvalonBay, Speltz, and Naylor the day after filing that motion.  Ramirez's motion was denied (Dkt. No. 24).  Ramirez's concurrent case was removed to federal court on the grounds that the only non-diverse defendants were sham defendants.  That case was related to this one.  *Ramirez v. AvalonBay Communities, Inc.*, No. 15-cv-3538 (N.D. Cal.).  Speltz and Naylor have moved to dismiss the claims against them therein, and that motion is now pending.

United States District Court
For the Northern District of California

11

United States District Court

For the Northern District of California

1    Returning to this case, AvalonBay has moved for summary judgment on all claims.  This

2    order follows full briefing and oral argument.[3]

3                                      **ANALYSIS**

4    **1.    DISCRIMINATION CLAIMS.**

5    Ramirez brings claims for sexual-orientation and disability discrimination under Section

6    12490(a) of the California Government Code.  Because state and federal employment

7    discrimination laws are similar, California courts look to federal precedent as well as state

8    precedent in adjudicating employment discrimination cases under Section 12490.  *Earl v.*

9    *Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011).  To establish a *prima facie*

10   case for discrimination, Ramirez must show:  (i) she was a member of a protected class, (ii) she

11   was qualified for the position she sought or was performing competently in the position she held,

12   (iii) she suffered an adverse employment action, and (iv) some other circumstance suggests

13   discriminatory motive.  *Guz v. Bechtel National, Inc.*, 24 Cal. 4th 317, 355 (2000).  If Ramirez

14   can establish a *prima facie* case, a presumption of discrimination arises, and the burden shifts to

15   AvalonBay to produce evidence of a legitimate, nondiscriminatory motive for her termination (or

16   any other adverse action).  *Id.* at 356.  If AvalonBay establishes it had a legitimate,

17   nondiscriminatory basis for terminating Ramirez, the presumption of discrimination established

18   in the first phase "simply drops out of the picture," and the burden shifts back to Ramirez to

19   provide "substantial responsive evidence" that AvalonBay's proffered reasons were "pretextual."

20   *Loggins v. Kaiser Permanente Int'l*, 151 Cal. App. 4th 1102, 1109 (2007).  A "plaintiff may

21   establish pretext either directly by persuading the court that a discriminatory reason more likely

22   motivated the employer or indirectly by showing that the employer's proffered explanation is

23   unworthy of credence."  *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  If a

24   plaintiff uses circumstantial evidence to satisfy this burden, such evidence "must be specific"

25   and "substantial."  *Id.* at 1221.

26

27   _____

28   [3] Ramirez's opposition to AvalonBay's motion was due on August 19.  No brief was timely filed.  On August 25, the Court granted in part a stipulated request for an extension and set the deadline for Ramirez's opposition as Monday August 31, at noon (Dkt. No. 43).  The order warned "[i]f no brief is timely filed, this case will be dismissed for failure to prosecute."  Ramirez did not file her brief until just before midnight on August 31.  Nevertheless, this order addresses the merits of Ramirez's case.

United States District Court

For the Northern District of California

In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000), the Supreme Court held that, in the context of a federal age discrimination suit, "a plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." Thus, if a plaintiff has made an initial showing from which a trier of fact could reasonably infer that her termination was motivated by intentional discrimination, she need only raise a genuine dispute as to the asserted justification. She need not raise *additional* evidence of discrimination beyond that already submitted in her *prima facie* case, if the evidence already supports the inference that the actual justification was discriminatory.

The California Supreme Court ruled that *Reeves* extended to discrimination claims under state law, and interpreted *Reeves* as rejecting "several federal court of appeals decisions holding that *even after* the plaintiff has presented *prima facie* evidence sufficient to establish an inference of prohibited discrimination in the absence of explanation, and has also presented evidence that the employer's innocent explanation is false, the employer is nonetheless *necessarily* entitled to *judgment as a matter of law* unless the plaintiff thereafter presents *further* evidence that the true reason was discriminatory." *Guz*, 24 Cal. 4th at 361. Nevertheless, to even reach the issue of pretext Ramirez must raise evidence that can support a reasonable inference of a causal link between the adverse employment actions taken against her and intentional discrimination in her *prima facie* case. Some examples of evidence that has been sufficient to establish a *prima facie* claim of discrimination are the temporal proximity of an employer's adverse actions and learning of the employee's protected status, direct evidence of discriminatory animus harbored by someone who influenced the adverse employment action at issue, or evidence that similarly situated employees who were not members of the plaintiff's protected class were treated more favorably. *E.g.*, *Poland v. Chertoff*, 494 F.3d 1174 (9th Cir. 2007); *Loggins v. Kaiser Permanente Intern.*, 151 Cal. App. 4th 1102, 1110 (2007); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103 (9th Cir. 2004).

Ramirez has failed to make even a bare showing of circumstantial evidence from which a jury could infer discrimination, even if all factual disputes are resolved in her favor. Although

United States District Court
For the Northern District of California

1  she does raise genuine disputes of fact as to whether the adverse employment actions taken

2  against her were harsh or inaccurate, Ramirez has failed to submit evidence that other employees

3  were not also treated harshly in response to similar issues or disciplined based on inaccurate or

4  incomplete versions of the underlying facts or that anyone at AvalonBay harbored any

5  discriminatory animus.  Accordingly, no rational trier of fact could infer that the adverse actions

6  taken against her were motivated by discrimination.

7          Ramirez has submitted her own sworn declaration averring to a different version of the

8  facts underlying the complaints about her that led to her termination.  To the extent her

9  testimony is admissible, it must be credited in a motion for summary judgment against her.

10  Thus, Ramirez has raised the following genuine disputes based on admissible facts:

11          Ramirez raises a dispute as to whether Speltz assigned her to the back office to work on

12  sorting packages only, without the ability to conduct tours.  Yet, she does not dispute that this

13  was the first time Speltz learned about her medical restriction, or that her restriction only

14  pertained to the number of tours, and made no mention of climbing stairs.  Even if Speltz should

15  have known about her three-tour-a-day restriction because she provided documentation to a prior

16  manager, she claimed she had a medical restriction *beyond* what was reflected in her doctor's

17  note, and it had affected her ability to perform her duties.  A jury could not infer that Speltz's

18  decision to reassign her, even if it was only to package duty, was motivated by discriminatory

19  intent.

20          Ramirez also claims that a heterosexual employee, Mary Bennett, received an

21  accommodation for a foot injury that allowed Bennett to offset a limitation on the number of

22  tours per day that she could perform, although Ramirez did not receive a comparable

23  accommodation for her knee injury.  The only evidence that Ramirez has submitted in support of

24  that contention is a work schedule from December 2013 that shows that Bennett was not in the

25  rotation to work in the back office for that month (Ramirez Decl., Exh. 7).  Ramirez has provided

26  no evidence that Bennett had a foot injury and no evidence apart from her own speculation that

27  Bennett was taken out of the rotation as an accommodation for that injury.  No inference of

28

14

discrimination can be drawn from the fact that a heterosexual employee was taken out of the back office rotation for a month.

Ramirez submits her own declaration and the declaration of her girlfriend to dispute that her girlfriend ever visited the office for more than 20 minutes, except when she waited for Ramirez to fill out an incident report after she hurt her knee a second time. She does not raise admissible evidence to dispute that Frederick heard complaints from her co-workers about visitors, that Frederick instructed her not to have visitors anymore, or that just days after Frederick was given that instruction, Speltz observed Ramirez chatting with her girlfriend in the office before the close of business.

Ramirez does not dispute that the audit report reflected that she had made zero renewal follow-up calls in November 2013. She claims that she *had* made those calls, but may not have recorded them properly. Nevertheless, she has not provided any evidence that she offered that explanation to Speltz when he wrote her up. She also claims that Speltz sought to make an example out of her because the Walnut Creek property had the worst renewal rates, but she fails to point to any evidence that Speltz's decision to write her up on that basis, rather than just give her a warning, was improper.

Ramirez does not dispute that she failed to assist her co-workers with sorting packages. Instead, she claims that she told her co-workers she would help as soon as she finished making renewal calls. She does not point to any evidence that she offered that explanation to Frederick when he wrote her up, or that it would have been improper for Frederick to write her up despite that explanation.

Ramirez disputes that she was actually rude to the individual who asked for a tour after 4:30, and she claims she was justified in refusing that tour based on fair housing laws. She disputes that Silva told her to make an exception for that individual, but she does not dispute that Silva attempted to contact her about it or that she should have called Silva before refusing the tour.

Ramirez disputes that a customer ever told her she wanted stainless steel appliances in her apartment. She does not dispute, however, that Speltz followed up with that customer and

United States District Court

For the Northern District of California

1    believed that the customer was telling the truth.  She claims she had e-mails that demonstrated

2    the customer never asked for stainless steel appliances, but she has not produced those e-mails

3    and those e-mails would not tend to disprove the customer's complaint that she had verbally

4    asked Ramirez for stainless steel appliances during a tour of a unit.

5         Finally, Ramirez claims that she was informed by Speltz that she was tied for the top

6    salesperson in northern California and that she had improved her renewal rates after Speltz

7    issued a write-up about her renewal follow-up calls.  Even if those assessments are true, Ramirez

8    was never written up about the quality of her sales, and in fact, some of the complaints from her

9    co-workers were about the fact that she did not contribute to team activities unrelated to sales.

10   Furthermore, Ramirez has not provided any evidence that the other performance issues proffered

11   by AvalonBay were insufficient to cause her termination.  A jury could not infer discriminatory

12   intent from the fact that the top salesperson was terminated as a result of an accumulation of

13   customer service complaints, complaints from co-workers, and insubordination, particularly

14   when several of the relevant complaints occurred after she was informed she was the top

15   salesperson.

16       Resolving all of these disputes in Ramirez's favor, she has only raised an inference that

17   the write-ups about her and her subsequent termination were harsh or based on objectively

18   incorrect assessments of the underlying facts.  If Ramirez had raised a dispute of fact supporting

19   a *prima facie* case of discrimination, a dispute about the accuracy of AvalonBay's claimed

20   reasons could be sufficient to survive summary judgment.  But Ramirez has not raised any

21   admissible evidence from which a jury could reasonably infer a causal link between

22   discrimination and her termination because she has simply provided no admissible evidence,

23   whether direct or circumstantial, of discrimination, as now discussed.

24               *               *               *

25       Ramirez claims that Speltz was especially harsh by writing up gay employees, but not

26   heterosexual employees, and that he pressured Frederick, Silva, and Naylor to treat Ramirez and

27   two other gay employees harshly as well.  Ramirez has not, however, submitted any admissible

28   evidence that could support even a bare inference that anyone at AvalonBay treated gay or

16

United States District Court

For the Northern District of California

1    disabled employees differently from heterosexual employees or employees without disabilities.

2    Ramirez has not even submitted evidence that the disciplinary actions taken against her were

3    uniquely harsh or based on an incomplete investigation into the underlying facts compared to any

4    other employee.

5        In her brief on this motion, Ramirez contends that Speltz "would walk around the office

6    stating for everyone to hear, 'I love Mary,' one of the heterosexual employees," and that he issued

7    write-ups to other gay employees while the heterosexual employees could get away with serious

8    violations with no consequences (Pl.'s Opp. at 7).  She also states that Speltz smiled and laughed

9    with heterosexual employees, but seldom did so with heterosexual employees (*id.* at 14).  *Those*

10   *claims are not supported by anything in the sworn record.*  Ramirez cites two paragraphs of her

11   declaration in connection with each of those claims, but neither supports Ramirez's conclusions.

12       The first paragraph cited pertains to Ramirez's interpretation of Speltz's decision to

13   rearrange the office by sending some employees to the back office (Ramirez Decl. ¶ 14).  Apart

14   from Ramirez's inadmissible speculation about Speltz's state of mind, the only item in that

15   paragraph that relates to Ramirez's claim of discriminatory treatment is the fact that the two other

16   gay employees were sent to the back office, while she herself was allowed to stay in the front

17   office and that one employee expressed anger about being moved.  Ramirez does not offer any

18   evidence as to whether or not any heterosexual employees were also transferred to the back

19   office.  Even assuming that no other employees were moved to the back office, Ramirez herself

20   was *not* moved, *at her own request*.  Ramirez avers that she requested to be kept in the front

21   office, but her unfounded claim that her sales numbers were the only thing that saved her from

22   Speltz's alleged discriminatory intent to move her is inadmissible speculation about Speltz's state

23   of mind.  A jury could not infer from these facts that any adverse employment action against

24   Ramirez was motivated by discriminatory intent.

25       The second paragraph that Ramirez cites as support for her conclusion that Speltz treated

26   heterosexual employees differently is her own assessment of her performance (*id.* ¶ 22).  Even

27   accepting Ramirez's assessment of her own sales and her renewal rates as true, she has failed to

28   submit any evidence of other employees' performances that could support an inference of

United States District Court

For the Northern District of California

1   intentional discrimination.  Ramirez also generally claims that her performance record is

2   inconsistent with the write-ups she received, but she does not dispute the contents or accuracy of

3   her performance reviews (in fact she has submitted them herself), all of which indicated that

4   Ramirez had issues with verbal and nonverbal communication, customer service, and

5   professionalism.  Again, even if these were harsh reviews, Ramirez has not pointed to any

6   evidence of other employees' performance evaluations at all, much less demonstrated that

7   similarly-situated employees that were not gay or disabled were not so harshly reviewed.

8          Ramirez claims that another of the gay employees, Cristy Smyth, "was afraid of Speltz

9   because of the way he treated her and the other gay employees and stated to Ms. Ramirez that she

10  believed he treated them this way because they were gay" (Pl.'s Opp. at 14).  Ramirez has not

11  provided any evidence whatsoever to support that contention.  To the contrary, Smyth herself

12  declared she has "never felt that [Speltz] has treated [her] differently because [she's] gay" (Smyth

13  Decl. ¶ 4).

14         Ramirez claims that Speltz "wrote up the gay employees every chance he got, while he

15  allowed heterosexual employees to get away with violations with no consequences, such as when

16  he allowed a heterosexual employee use her sister use [sic] her employee rent discount which

17  violated Avalon policies, but she was allowed to do it with no consequences" (Pl.'s Opp. at 15).

18  Ramirez has not submitted any evidence of an employee rent discount, a policy about who can

19  use the discount, or a heterosexual employee using such a discount improperly without

20  consequence.  Ramirez's claim that Speltz wrote up the gay employees every chance he got is

21  inadmissible speculation and not based on Ramirez's personal knowledge.  She also has failed to

22  provide any evidence of how Speltz or anyone else at AvalonBay handled disciplinary actions

23  with any other employees.

24         Finally, Ramirez comes closest by arguing that she received numerous write-ups after she

25  began dating her current girlfriend in December, but it is undisputed that she received numerous

26  write-ups before that, nor has she provided any evidence that she was this was the first time

27  Speltz (or anyone else) learned she was gay.  On the contrary, Ramirez herself contends that

28

United States District Court

For the Northern District of California

1   Speltz knew she was gay when he first sought to reorganize the office.  A jury could not infer

2   from the timing of these write-ups that the write-ups were motivated by discriminatory intent.

3       Ramirez has failed to submit any admissible evidence, even in her own sworn declaration,

4   that tends to show that Speltz or anyone else at AvalonBay treated gay or disabled employees, or

5   even Ramirez on her own, differently from heterosexual employees or employees without

6   disabilities.  Accordingly, AvalonBay is entitled to summary judgment on both of Ramirez's

7   discrimination claims.

8                    *                    *                    *

9       Ramirez's fourth claim is for tortious discharge in contravention of California public

10  policy against discrimination on the basis of disability.  As Ramirez's discrimination claim fails,

11  so must her tortious discharge claim.  Where no predicate violation of the law has occurred, a

12  plaintiff cannot state a claim for wrongful termination in violation of the law.  *Green v. Ralee*

13  *Engineering Co.*, 19 Cal. 4th 66, 79 (1998).  Thus, AvalonBay is entitled to summary judgment

14  on Ramirez's fourth claim.

15      Ramirez mentioned a claim for retaliation in her briefs on this motion.  Retaliation is not

16  mentioned anywhere in the complaint, and at oral argument, counsel for Ramirez acknowledged

17  that retaliation is not part of this case.  This order will not address a retaliation claim that was not

18  pled.

19          **2.    HARASSMENT CLAIM.**

20      Ramirez's claim for harassment is simply a repetition of her discrimination claims.  That

21  is, the only harassment alleged is that her managers at AvalonBay "continuously wrote her up for

22  issues other employees did not get written [up] for, punished her because she had a disability,

23  and failed to accommodate her and engage in the interactive process, all out of harassment for

24  sexual orientation" (Compl. ¶ 45).  Although the adverse employment actions addressed in that

25  allegation could be found discriminatory, the California Supreme Court determined in *Reno v.*

26  *Baird*, 18 Cal. 4th 640, 646–47 (1998), that such activities cannot constitute harassment:

27

28

United States District Court
For the Northern District of California

1

> Harassment, by contrast, consists of actions outside the scope of job duties which are not of a type necessary to business and personnel management. This significant distinction underlies the differential treatment of harassment and discrimination in the FEHA.

Thus, AvalonBay is entitled to summary judgment on Ramirez's third claim.

### 3.   FAILURE TO ACCOMMODATE CLAIM.

Although Ramirez described her second claim as "Disability Discrimination/Failure to Accommodate; Gov't Code Section 12940(a)," her complaint did not state a claim for failure to accommodate. The description of that claim in her complaint pertained to Speltz's alleged discrimination against Ramirez by requiring her to sit in the back office due to her injury. It did not allege that Speltz failed to provide a reasonable accommodation once he was informed of her alleged limitations. The provision that Ramirez cited as the basis for her second claim only pertains to discrimination. Section 12940(m) is the provision that pertains to reasonable accommodations. Ramirez cannot defeat summary judgment by alleging a new claim for failure to accommodate in her opposition. Discrimination and failure to accommodate are distinct claims with unique elements.

Even so, Ramirez obviated the need for a reasonable accommodation when she came in the next day with a doctor's note clearing her of any restriction instead of notifying anyone in human resources or any other supervisor that she felt Speltz's accommodation (moving her to the back office) was not the appropriate accommodation given the scope of her limitations.

Ramirez did not raise a failure to accommodate claim in her complaint and cannot now defeat summary judgment by claiming she was denied a reasonable accommodation.

**CONCLUSION**

To the extent stated above, AvalonBay's motion for summary judgment on all claims is **GRANTED**.  The Clerk shall **CLOSE THE FILE**.

AvalonBay requested that the Court take judicial notice of a court of appeals decision affirming a district court decision, because it did not cite that decision for precedential purposes. That decision was not necessary to this order, so that request is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

Dated:    September 26, 2015.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

*United States District Court*
For the Northern District of California